**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C. and SLING TV L.L.C., | |
| *Plaintiffs*, | **C.A. No. _____** |
| v. | **JURY TRIAL DEMANDED** |
| IFIT HEALTH & FITNESS, INC., | |
| *Defendant*. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs DISH Technologies L.L.C. and Sling TV L.L.C. (collectively, "DISH") allege against Defendant iFIT Health & Fitness, Inc., formerly known as ICON Health & Fitness, Inc., as follows:

**PARTIES**

1.      Plaintiff DISH Technologies L.L.C. is a limited liability company organized and existing under the laws of the State of Colorado, with its principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.  It provides innovation and technology services and products to, among others, the DISH Network® satellite pay TV service operated by DISH Network L.L.C. and the Sling TV® streaming pay TV service operated by Sling TV L.L.C.

2.      Plaintiff Sling TV L.L.C. is a limited liability company organized and existing under the laws of the State of Colorado, with its principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.  It operates the Sling TV® streaming pay TV service.

3.      On information and belief, Defendant iFIT Health & Fitness, Inc. ("iFIT") is a corporation existing under the laws of the State of Delaware, with its principal place of business

at 1500 S. 1000 W Logan, UT 84321.  This Defendant has appointed The Corporation Trust Company at 1209 Orange St., Wilmington DE 19801 as its agent for service of process.

4.      On information and belief, iFIT operates online streaming services through its iFit® software, which it provides on certain iFIT fitness equipment and is made available for download through the Apple iTunes Store and Google Play store.

## JURISDICTION AND VENUE

5.      DISH asserts a claim for patent infringement against iFIT arising under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over iFIT for at least the following reasons: (1) iFIT Health & Fitness, Inc. is incorporated in Delaware; (2) iFIT has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District; (3) iFIT regularly does business or solicits business in this District; (4) iFIT engages in other persistent courses of conduct and derives substantial revenue by its offering of infringing products and services and providing infringing products and services in this District; and (5) iFIT has purposefully established substantial, systematic, and continuous contacts with this District and should reasonably expect to be subject to suit here by its offering of infringing products and services and providing infringing products and services in this District.

7.      Venue is proper in the District of Delaware under at least 28 U.S.C. §§ 1391(b), (c) and/or 1400(b) at least because iFIT Health & Fitness, Inc. is incorporated in Delaware. Additionally, on information and belief, iFIT has committed acts of infringement in the State of Delaware, including but not limited to offering products or services that infringe one or more of DISH's asserted patents to customers located in Delaware and/or for use in Delaware.

**THE ABR PATENTS**

8.      On October 11, 2022, the PTO duly and lawfully issued United States Patent No. 11,470,138 ("the '138 Patent"), entitled "Apparatus, system, and method for multi-bitrate content streaming."  A true and correct copy of the '138 Patent is attached as Exhibit 1.  Subject to the exclusive license referenced below, all rights, title, and interest in and to the '138 Patent have been assigned to DISH Technologies L.L.C., which is the sole owner of the '138 Patent.

9.      On June 13, 2023, the PTO duly and lawfully issued United States Patent No. 11,677,798 ("the '798 Patent"), entitled "Apparatus, system, and method for multi-bitrate content streaming."  A true and correct copy of the '798 Patent is attached as Exhibit 2.  Subject to the exclusive license referenced below, all rights, title, and interest in and to the '798 Patent have been assigned to DISH Technologies L.L.C., which is the sole owner of the '798 Patent.

10.     DISH Technologies has entered into an exclusive license with Sling TV L.L.C. granting substantial rights in the above-identified patents to Sling TV L.L.C., including the right to sue thereon.

11.     Certain of Sling TV L.L.C.'s products and services practice one or more of the Asserted Patents.  In compliance with 35 U.S.C. § 287(a), Sling TV L.L.C. marks its practicing products and requires its sublicensees to do the same.

12.     Additionally, certain products and services offered by DISH Technologies' affiliate DISH Network L.L.C. ("DISH Network") also practice the Asserted Patents.  DISH Network marks its practicing products and maintains a webpage identifying a listing of patents applicable to DISH Network's products.  *See Intellectual Property*, DISH NETWORK, https://www.dish.com/ip/ (last visited Aug. 31, 2023).

13.     The claimed inventions in these patents are directed to various novel aspects and improvements to adaptive bitrate streaming ("ABR") technology.  The '138 and '798 Patents (collectively, "the ABR Patents") are currently in full force and effect.

**BACKGROUND OF THE DISPUTE**

**MOVE IS A PIONEER OF ADAPTIVE BITRATE TECHNOLOGY**

14.     The '138 and '798 Patents are part of a family of patents issued from U.S. Patent Application No. 11/116,783, which was originally owned by Move Networks, Inc. ("Move"). Move invented and patented HTTP-based Adaptive Bitrate Streaming to improve the quality of streamed video content over the Internet.  While at Move, inventors Drew Major, Mark Hurst, and later, David Brueck, (collectively, "the ABR Inventors") observed that the Internet was fast becoming a preferred method for distributing live and recorded video to individuals even though content delivery over the Internet at the time was notoriously unreliable, expensive and inferior in quality compared to cable- and satellite-delivered content.  To access video content online, users were left with two mediocre choices: (1) waiting for their content to download (which did not support immediate viewing of live content and often required the user to select the quality desired: LOW, MEDIUM, or HIGH, which in turn determined how long the user had to wait before viewing); or (2) streaming live or recorded content, which often was unreliable (pausing to "buffer") or only worked at low-resolution.

15.     The ABR Inventors knew that media streaming had not reached its full potential and that, through research and improvement, it was possible that streaming could rival the quality of cable and satellite delivered content.  The state-of-the-art, though, was unacceptable prior to the inventions disclosed in the patents-in-suit.  Often during playback, the streaming technologies did a poor job selecting the video quality / resolution that the network bandwidth and reliability could support.  Most commercial systems, from companies like RealNetworks, Adobe, Microsoft, or

Apple, were proprietary implementations based on public Internet standards (RTP/RTSP). Common standards notwithstanding, the proprietary implementations were mutually incompatible. They were expensive to deploy by the Content Delivery Networks ("CDNs") and required many servers to scale to a large number of viewers. In addition, these technologies often required custom server architectures and routing IT configurations to penetrate Internet firewalls. The ABR Inventors recognized these shortcomings as an opportunity and developed a better solution.

16.    The ABR Patents' specifications detail the need for improved data transport in content streaming. Users will generally choose streaming over downloading because "they tend to want to see or hear the media files instantaneously." '138 Patent, Exhibit 1, at col. 1, ll. 66–67. Unfortunately for protocols at the time, "[s]treaming offers the advantage of immediate access to the content but currently sacrifices quality compared with downloading a file of the same content." *See, e.g., id.* col. 2, ll. 1-3. The ABR Inventors observed that "a need exists for an [invention] that alleviate[s] the problems of reliability, efficiency, and latency" encountered in currently available content streaming systems. *See, e.g.*, *id.* col. 2, ll. 58–60.

17.    To address these needs, the ABR Inventors came up with a novel solution: HTTP-based Adaptive Bitrate Streaming. ABR segments the full content file into smaller units ("streamlets") in multiple bitrates and delivers them over HTTP / TCP, the underlying protocols used for reliably transmitting data over the Internet. The ABR Inventors' approach enables content delivery to adapt to the bandwidth available at any particular time, including startup, ensuring delivery of the highest possible quality content. The other RTP/RTSP-based technologies used a client / server architecture, where the server determined the bitrate to send to the client. The other technologies also did not segment the content, usually delivering it as a continuous stream of bits or as a single large file. Segmenting the content allows the playback device to easily change bitrates. The result

is that today, Move's patented ABR technology allows Internet users to stream content from across the world in real time at the highest possible quality.

18.     The ABR Patents' specifications describe how the Move inventors significantly improved the functionality of computer devices used to stream content data over a network: "[A] need exists for an apparatus, system, and method that alleviate the problems of reliability, efficiency, and latency [during data transport streaming over a network].  Additionally, such an apparatus, system, and method would offer instantaneous viewing along with the ability to fast forward, rewind, direct seek, and browse multiple streams." *See, e.g.*, *id*. col. 2, ll. 58–63.  The claims of the ABR Patents embody these improvements by providing a particular solution to these problems.  The ABR Patents' specifications explain that "[t]he present invention has been developed in response to the present state of the art, and in particular, in response to the problems and needs in the art that have not yet been fully solved by currently available content streaming systems." *See, e.g.*, *id*. col. 3, ll. 3-6.  Thus, the specifications explain "the present invention has been developed to provide an apparatus, system, and method for adaptive-rate content streaming that overcome many or all of the above-discussed shortcomings in the art." *See, e.g.*, *id*. col. 3, ll. 7-10.  The claims of the ABR Patents include numerous unconventional and revolutionary elements that, taken as a whole, provide this solution that improves the functionality of computer devices used to stream content data over a network.

19.     One unconventional but fundamental improvement found in the claims of the ABR Patents is the creation of sets of streamlets from the original large content file, where a plurality of streamlets in each set are aligned by starting time and duration (typically a few seconds) but have different bitrates.  By segmenting and then encoding the streamlets, the claims of the ABR Patents allow for contiguous playback of the streamlets that independently yields playback of the full

content.  The common alignment of the streamlets in each set allows a playback device to select one quality of streamlet from a particular set based on the available bandwidth.  When the bandwidth of the user's network is constrained, the client can select a lower bitrate to maintain playback continuity instead of "buffering."  By using streamlets, the claims of the ABR Patents eliminate the need for users to download the full content file before beginning playback, thereby offering instantaneous viewing along with the ability to fast forward, rewind, direct seek, and browse multiple streams.  Additionally, segmenting the media into streamlets as required by the claims of the ABR Patents enables users to retrieve and enjoy content at the most appropriate bitrate possible as the media is streamed, thereby reducing latency and improving the reliability and efficiency of computer devices used to stream content data over a network.  It is also well suited for live stream playback.

20.     Another non-routine and revolutionary improvement found in the claims of the ABR Patents is that the client controls switching between different bitrates.  The benefits of using an intelligent client to make the decisions and switch between different bitrate streamlets are two-fold.  First, the claims of the ABR Patents reduce latency and improve the efficiency of computer devices used to stream content data over a network because the client is in a better position to determine the appropriate streamlet by measuring the actual throughput of the network at its point of reception.  Second, the claims of the ABR Patents improve the reliability and efficiency of computer devices used to stream content data over a network because moving the decision-making to the client effectively eliminates the need for a customized video server.  Instead, a standard web server can be employed to host all the content's streamlets.  Streamlets may be requested by a client using the standard HTTP/TCP protocol—the web standard upon which the Internet is built. Shifting control of switching between different bitrates to the clients allows for access to the

segmented content that can be scaled exponentially through the use of standardized web caches. These benefits also allow for a vast reduction in operating and publishing costs. Thus, the claims of the ABR Patents provide a reliable and efficient solution that improves the functioning of computer devices used to stream content data while reducing overall latency and network congestion.

21.    The ABR Inventors' improvements to streaming succeeded where others tried and failed. During the late 1990s, established streaming companies, including RealNetworks, Adobe, Microsoft, and Apple, separately attempted to develop a successful multiple bitrate streaming platform by using proprietary implementations of the RTP/RTSP standards. None of these systems succeeded at making bitrate switching consistent and none actually worked over the Internet.

22.    The unconventional and revolutionary improvements embodied by the claims of the ABR Patents were also recognized by numerous industry leaders and commentators. For example, Forbes explained that Move Networks was "at the forefront of [the] next evolution" of media streaming. Exhibit 3. Forbes explained that the technology covered by the ABR Patents "breaks up the video into bits and efficiently reorganizes them over the network so there's no need for the special computer servers and dedicated transmission lines." *Id*. Move Networks was identified as a member of the Red Herring 100 in 2007. Exhibit 4. Industry leaders "have regarded the Red Herring 100 lists as an invaluable instrument to discover and advocate the promising startups that will lead the next wave of disruption and innovation." Exhibit 5. Similarly, Move Networks was also named as a member of the OnHollywood 100 in 2007. Exhibit 6. The list is curated by AlwaysOn to "introduce a new generation of game-changing players in the digital entertainment space." *Id*. Move Networks was also nominated as a finalist in the 2007 Crunchies for the "Best

Technology Innovation / Achievement" category by GigaOm, Read/WriteWeb, VentureBeat, and TechCrunch.  Exhibit 7.

## ABR PATENTS SELL FOR $45 MILLION

23.     In December of 2010, EchoStar Advanced Technologies L.L.C., then a wholly owned subsidiary of EchoStar Corporation, spent $45 million to acquire Move and its ABR Patent portfolio.  Recognizing the ingenuity of Move's ABR technology and the value-added for its customers and their increasing interest in quality online content delivery, DISH affiliate DISH Digital Holding L.L.C. acquired EchoStar Advanced Technologies L.L.C. in connection with a joint venture with EchoStar Corporation in 2012.  EchoStar Advanced Technologies L.L.C., which was later renamed DISH Digital L.L.C., transferred the ABR Patents to EchoStar Technologies L.L.C. (a subsidiary of EchoStar Corporation) in 2014.  In February 2017, EchoStar Technologies L.L.C. became a subsidiary of DISH Network L.L.C., and in February 2018, was renamed DISH Technologies L.L.C.

24.     DISH and its affiliated companies are a leading provider of Internet streaming services. It is a leading investor and innovator in infrastructure and technologies that will meet the personalized needs of its increasingly diverse pool of customers.  Since its founding, DISH and its affiliated companies have invested millions in research and development and acquisition of novel technologies that will resolve long-felt problems and needs across its industry.

25.     As the public continues to increasingly rely on the Internet for its informational and entertainment needs, one such problem into which DISH and its affiliated companies have dedicated great time and resources is improving the quality of streaming media.  The specific entities that implement and own the technology covered by Move's patent portfolio have undergone significant evolution as these entities continue to improve upon ABR and advance reliable delivery of high-resolution content over the Internet.

26.    DISH's recent investments in ABR have already proven a success.  Sling TV L.L.C. is DISH and its affiliated companies' main Internet-delivered content provider, offering programming to numerous Internet streaming devices.  Since the launch of Sling TV in the beginning of 2015, Sling TV has grown to over two million subscribers, who are now receiving a live TV video experience comparable to cable or satellite.

### SUMMARY OF RELEVANT PRIOR ITC PROCEEDINGS

27.    On April 13, 2021, DISH filed a complaint against iFIT (and others) at the U.S. International Trade Commission ("ITC"), requesting institution of an investigation to determine whether iFIT violated 19 U.S.C. § 1337 by importing, selling for importation, or selling within the United States, various iFIT products (the "Previously Accused Products") that infringed five patents assigned to DISH and directed to ABR technology (the "Previously Asserted Patents"). Exhibit 8.  Notably, the Previously Asserted Patents issued from patent applications that are continuations or continuations-in-part of the same original parent application as the '138 and '798 Patents.  The ITC instituted its investigation with respect to the Previously Asserted Patents on May 13, 2021.  Exhibit 9.  After institution of the investigation but before issuance of the Final Initial Determination by the ITC's Administrative Law Judge, DISH withdrew its claims against iFIT with respect to one of the five Previously Asserted Patents.  Exhibit 10 at 2.  Subsequently, the ITC issued its Final Determination, finding, among other things, that iFIT's Previously Accused Products infringed the remaining four Previously Asserted Patents and issued a limited exclusion order and cease and desist orders against iFIT consistent with its findings.  Exhibit 11 at 1, 33, 57, & 93; *see also* Exhibits 12a-12c.

28.    iFIT proceeded to attempt redesign of its fitness devices such that the quality of the requested content is determined based on the initially available bandwidth before delivery of the stream rather than being continuously adjusted throughout the course of the stream.  Relying on this

alleged redesign, iFIT submitted a Ruling Request to the United States Customs and Border Protection ("CBP") under 19 C.F.R. Part 177, asking CBP to consider whether its "redesigned fitness devices" infringe three of the remaining four Previously Asserted Patents.  Exhibit 13 at 1 & 11.  On June 30, 2023, CBP issued a public ruling letter that it determined that certain of iFIT's "redesigned fitness devices" were outside the scope of the ITC's limited exclusion order. *Id.*

## DISH'S NEWLY ISSUED PATENTS

29.     After the investigation of the five Previously Asserted Patents was instituted by the ITC but before the issuance of the public ruling letter by the CBP, the '138 and '798 Patents issued to DISH.  The '138 and '798 Patents stem from the same original parent application as the five Previously Asserted Patents.  The '138 and '798 Patents, however, claim different subject matter that was not considered by either the ITC or the CBP in making their determinations.  Accordingly, DISH asserts the '138 and '798 Patents against iFIT's infringing products and services in the United States (*see infra*), including the infringing products identified by iFIT during the CBP proceedings, which iFIT claims are redesigns of the Previously Accused Products.

## IFIT'S PRODUCTS AND SERVICES INFRINGE THE ABR PATENTS

30.     iFIT has been and is now directly infringing and/or indirectly infringing the ABR Patents.

31.     On information and belief, iFIT is a distributor of live and on-demand content via the Internet.  Exhibit 14 at 1-2.  iFIT makes, uses, sells, and offers for sale in the United States, and imports into the United States, products and services that infringe the ABR Patents, and continues to do so.  These infringing products and services include online streaming services operated by iFIT, including the iFIT software and iFIT equipment (e.g., stationary bikes, treadmills, elliptical trainers, strength trainers, rowing machines, and flat-panel fitness devices) (collectively, "the Accused Streaming Products").

32.     iFIT makes the Accused Streaming Products available on standalone devices, such as its digital fitness Sweat app, as well as on certain fitness equipment sold by iFIT through its fitness brands NordicTrack, ProForm, Freemotion, Weider and Matrix:



IFIT, https://www.ifit.com/equipment (last visited Aug. 31, 2023) ("iFit Explore Equipment").

**iFIT** ▶

OUR STORY   OUR BRANDS   OUR LEADERSHIP   NEWSROOM   CONTACT

[iFIT.com]



### NordicTrack
**PREMIUM CONNECTED HOME FITNESS**
—
NordicTrack is #1 in both treadmills and ellipticals. iFIT interactive personal training is the heart of NordicTrack, providing a synergistic, complete fitness experience to consumers around the world. NordicTrack brings a new level of interactivity, with machines controlled digitally by elite personal trainers brought to you by our iFIT technology.

VISIT SITE →



### PRO-FORM
**CONNECTED HOME FITNESS**
—
ProForm brings iFIT interactive fitness technology to the mass market at affordable price points. ProForm's award-winning connected equipment includes treadmills, ellipticals, cycles, climbers and fitness mirrors.

VISIT SITE →



### WEIDER
**INTERACTIVE STRENGTH TRAINING**
—
Weider brand taps into a multi-decade legacy that resonates with the strength training consumer ranging from novice to pro. Weider's heritage combines with iFIT technology to offer interactive strength and resistance workouts with the guidance and progression this consumer seeks.

VISIT SITE →



### FREEMOTION
**COMMERCIAL FITNESS**
—
Freemotion Fitness is the global pioneer in commercial fitness equipment and technology, introducing the world to cable-based strength training, the Incline Trainer, the first road-simulating indoor bike and is now leading the way in interactive, connected fitness. With science and innovation at its core, Freemotion questions how we work out and then redefines it - creating products that deliver an unbeatable user experience and ultimately drive commercial results for its partners.

VISIT SITE →



### SWEAT ◊
**DIGITAL FITNESS**
—
Sweat has engaged with millions of women around the world on their journeys to become healthier, stronger and more confident. The Sweat platform, cofounded by Kayla Itsines and Tobi Pearce, is powered by a team of industry-leading personal trainers and offers over 5,000 unique workouts across 26 exercise programs ranging from high-intensity interval training and strength to yoga, barre and Pilates.

VISIT SITE →

IFIT, https://company.ifit.com/en/our-brands/ (last visited Aug. 31, 2023) ("iFit Our Brands").

EQUIPMENT

# *Get equipped*

Take it to the next level and track your progress with our world-class equipment.



### Running

Run the distance and train in new ways with cutting-edge treadmills.

Explore Treadmills



### Cycling

Cycle closer to your goals with entertaining workouts and personalized training.

Explore Bikes



### Cross-Training

Enjoy low-impact workouts that still deliver elevated calorie burn alongside motivating trainers.

Explore Elliptical



### Rowing

Row your way to total-body fitness through trainer-led cardio workouts filmed on epic waterways.

Explore Rower



### Strength

Complete your strength and cardio workouts simultaneously with ground-breaking equipment and interactive workouts.

Explore Strength



### Fitness Mirrors

Improve your body form with interactive, mirrored workouts and unique, total-body training.

Explore Fitness Mirrors

IFIT, https://www.ifit.com/equipment (last visited Aug. 31, 2023) ("iFit Explore Equipment").

iFIT APP

## *3 ways to use iFIT*

  

**Use our equipment**          **Use your equipment**          **Just use our app**

*Id*.; *see also* https://www.ifit.com/apps/ifit-mobile-app ("Connected Fitness - Whether at home or on the road, our app allows you to get your workout in, with or without fitness equipment."); *see also* Exhibit 15 at 1-2 ("iFIT comes on a variety of fitness equipment, including treadmills, bikes, ellipticals, rowers, and strength machines.  We can be found built into brands like NordicTrack, ProForm, and Freemotion.").  Notably, iFIT markets itself as "the only company which creates a connected fitness experience across multiple brands, multiple product categories and all consumer fitness segments."  Exhibit 14 at 1.  On information and belief, iFIT is the importer of record for all fitness equipment sold under the NordicTrack, ProForm, FreeMotion, Weider, and Matrix brands.  The Accused Streaming Products include, but are not limited to, the following iFIT equipment:

| Equipment Type | iFIT Equipment |
|---|---|
| Stationary Bikes | ProForm Carbon CX<br>ProForm Pro C10U<br>ProForm Studio Bike Limited<br>ProForm Studio Bike Pro<br>ProForm Studio Bike Pro 22<br>ProForm TDF CSC<br>FreeMotion Coachbike<br>FreeMotion r22.9<br>FreeMotion u22.9 |

| Equipment Type | iFIT Equipment |
|---|---|
| | NordicTrack Commercial S27i |
| | NordicTrack Commercial S22i |
| | NordicTrack Commercial R35 |
| | NordicTrack Commercial VU 19 |
| | NordicTrack Commercial VU 29 |
| | Matrix Cycle R30 |
| | Matrix Cycle R50 |
| | Matrix Cycle U30 |
| | Matrix Cycle U50 |
| | Matrix Cycle ICR50 |
| Treadmills | ProForm Carbon T7 |
| | ProForm City L6 |
| | ProForm Pro 2000 |
| | ProForm Pro 9000 |
| | FreeMotion t22.9 |
| | NordicTrack X22i |
| | NordicTrack X32i |
| | NordicTrack Commercial 1750 |
| | NordicTrack Commercial 2450 |
| | NordicTrack Commercial 1250 |
| | NordicTrack EXP 7i |
| | NordicTrack EXP10i |
| | NordicTrack EXP 14i |
| | Matrix TF30 |
| | Matrix TF50 |
| | Matrix T30 |
| | Matrix T50 |
| | Matrix T75 |
| Elliptical Trainers | ProForm Pro HIIT H14 |
| | ProForm Carbon HIIT H10 |
| | ProForm Carbon EL |
| | ProForm Carbon E10 |
| | FreeMotion e22.9 Elliptical |
| | NordicTrack FS10i |
| | NordicTrack FS14i |
| | NordicTrack Commercial 9.9 |
| | NordicTrack Commercial 14.9 |
| | NordicTrack AirGlide 14i Elliptical |
| | Matrix E30 |
| | Matrix E50 |
| | Matrix A30 |
| | Matrix A50 |
| Strength Trainers | NordicTrack Fusion CST Studio |
| Rowing Machines | ProForm R10 |
| | ProForm 750R |
| | NordicTrack RW600 |
| | NordicTrack RW700 |
| | NordicTrack RW900 |
| Flat Panel Fitness Devices | ProForm Vue |
| | ProForm Vue 180 |
| | NordicTrack Vault: Complete |
| | NordicTrack Vault: Standalone |

33.     On information and belief, the vast majority of all fitness equipment sold by iFIT is enabled with iFIT software.  Exhibit 16 at 1 ("Virtually all our products sold are connected fitness, this is no longer a trend.").

34.     The Accused Streaming Products are defined by an integrated experience of hardware, software, and content.  For example, an iFIT press release states that "iFit's proprietary streaming technology allows a multi-faceted interaction between the user, their iFit trainer and their smart machine. iFit seamlessly adjusts . . . iFit-enabled machines in sync with interactive trainer-led streaming workouts shot on location around the world."  Exhibit 17 at 1.

35.     iFIT's implementation of such "proprietary" streaming technology was further fueled by a $200 million dollar investment in 2020 led by L. Catterton, with participation from prior investor Pamplona Capital Management.  Exhibit 18 at 1.  The investment was to further accelerate the company's "unique growth strategy of delivering its expansive range of interactive fitness products connected to iFit" so that its approximately 700,000 paid subscribers at the time may enjoy iFIT "in the home, at the gym and on-the-go across [iFIT's] diverse range of products and partnerships."  *Id.*

36.     Approximately two years later in 2022, iFIT received an additional $355 million dollar investment from L. Catterton in partnership with Pathlight Capital.  Exhibit 19 at 1; *see also* Exhibit 20 at 2 ("Pathlight was proud to partner with *L* Catterton and the management team in providing liquidity to support the innovation iFIT delivers to the health and fitness market").  The proceeds from this investment were to be used in "growth initiatives, efficiency measures to enhance profitable growth, as well as elevate the iFIT member experience by continuing to innovate across interactive software, content, and hardware."  Exhibit 20 at 2.  Such "innovation" led iFIT to become "a global leader in connected fitness and interactive content" with "industry-

leading brands – NordicTrack®, ProForm®, Sweat®, Freemotion®, Weider® and 29029®" – offering an extensive array of "live and on-demand content across the industry's broadest range of connected fitness modalities."  Exhibit 19 at 1 & 2.

37.     iFIT's founder, chairman, and former CEO, Scott Watterson, has recognized iFit as "the leader in streaming fitness technology" and has noted that the ability to stream workouts using iFIT software has made fitness more affordable and accessible.  Exhibit 21 at 2; *see also* Exhibit 22 at 2 ("We look forward to bringing iFit workouts to the masses.  Regardless of their equipment type, iFit workouts can now take anyone's exercise experience to an entirely new level.").

38.     On information and belief, the Accused Streaming Products provide an "interactive fitness streaming platform" that "delivers beautiful global workouts, high-energy studio classes, and the best personal trainers right to [a user's] machine."  Exhibit 17; Exhibit 23  An example of a fitness class available for streaming through iFit is shown below:



### CLAIMS FOR RELIEF

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 11,470,138

### DIRECT INFRINGEMENT

39.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–38 of the Complaint as if fully set forth herein.

40.    On information and belief, iFIT directly infringes, literally and/or under the doctrine of equivalents, at least claim 14 of the '138 Patent, which recites:

> An end user station to stream a video over a network from a server for playback of the video, the end user station comprising;
>
> a processor;
>
> a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to;

establish an internet connection between the end user station and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;

wherein the video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, each of the low quality stream, the medium quality stream, and the high quality stream comprising a group of streamlets encoded at the same respective one of the different bitrates, each group comprising at least first and second streamlets, each of the streamlets corresponding to a portion of the video;

wherein at least one of the low quality stream, the medium quality stream, and the high quality stream is encoded at a bitrate of no less than 600 kbps; and

wherein the first streamlets of each of the low quality stream, the medium quality stream and the high quality stream each has an equal playback duration and each of the first streamlets encodes the same portion of the video at a different one of the different bitrates;

select a specific one of the low quality stream, the medium quality stream, and the high quality stream based upon a determination by the end user station to select a higher or lower bitrate version of the streams;

place a streamlet request to the server over the internet connection for the first streamlet of the selected stream;

receive the requested first streamlet from the server via the internet connection; and

provide the received first streamlet for playback of the video.

41.    The Accused Streaming Products receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Products make an initial selection of segments from a set of segments with the same content but varying quality based upon the quality of the network connection when the stream is requested.  Exhibit 24 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Products.[1]

---

1. DISH notes that Exhibit 24 and Exhibit 25, *see infra*, are based exclusively on publicly available information.  Accordingly, for each Count below, DISH reserves the right to supplement, amend or modify the analysis as warranted in light of additional facts, claim construction, or other developments.  DISH further reserves the right to add additional claims as the case progresses.

42.     On information and belief, iFIT possesses knowledge of, and is aware of, the '138 Patent, at least through a listing of parent patents to the '138 Patent in the Public Schedule of the DISH settlement agreement with Peloton, which was served on iFIT on May 2, 2023.  Exhibit 26 at 20-21 (listing, at least, U.S. Patent Nos. 10,659,513; 9,998,516; 9,571,551; 9,071,668; 8,612,624; 8,402,156; 7,818,444; and 8,868,772, all of which are parent patents to the '138 Patent).  At the very least, iFIT became aware of the '138 Patent at the time of filing this lawsuit.

43.     iFIT's acts of infringement have injured and damaged DISH and will continue to injure and damage DISH.

44.     iFIT's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, iFIT will continue these infringing acts unless enjoined by this court.

## INDIRECT INFRINGEMENT BY INDUCEMENT

45.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–**Error! Reference source not found.** of the Complaint as if fully set forth herein.

46.     On information and belief, iFIT is liable for inducing infringement of the '138 Patent under 35 U.S.C. § 271(b) by having knowledge of the '138 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '138 Patent, with specific intent, by its customers.

47.     Specifically, iFIT actively induces infringement of the '138 Patent by, *inter alia*, training its customers on the use of the Accused Streaming Products and/or promotion and/or sales of the Accused Streaming Products to iFIT's customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for implementing adaptive-rate content streaming as claimed in the '138 Patent.

48.   iFIT's customers for the Accused Streaming Products directly infringe the '138 Patent by making, using, selling, and/or offering for sale the Accused Streaming Products.

49.   For example, iFIT actively induces infringement of the '138 Patent, because iFIT has knowledge that end users of the Accused Streaming Products including, but not limited to, users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms, use iFIT's infringing Accused Streaming Products in the United States, and because iFIT encourages such acts resulting in direct patent infringement, by, *inter alia*, training, promotion, and/or sales of the Accused Streaming Products to iFIT customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for their use of adaptive-rate content streaming as claimed in the '138 Patent. *See, e.g.*, Exhibit 15; Exhibit 27; Exhibit 28; Exhibit 29.

50.   On information and belief, iFIT intends to, and continues to intend to, indirectly infringe the '138 Patent through inducement of the sale and use of the Accused Streaming Products.

51.   Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe, and DISH since its acquisition and continuing development of Move's patent portfolio.  On information and belief, as a provider of streamed content and a party to prior ITC proceedings involving patents stemming from the same original parent application, iFIT would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '138 Patent.

52.   On information and belief, despite knowing that its actions constituted induced infringement of the '138 Patent and/or despite knowing that there was a high likelihood that its

actions constituted induced infringement of the patent, iFIT nevertheless continued its infringing actions, and continues to make, use, and sell, the Accused Streaming Products.

53.     iFIT continues to provide the Accused Streaming Products with full knowledge and disregard of the ABR Patents, including the '138 Patent.

54.     iFIT's acts of induced infringement have injured and damaged DISH and will continue to injure and damage DISH.

55.     iFIT's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, iFIT will continue these infringing acts unless enjoined by this Court.

### INDIRECT INFRINGEMENT BY CONTRIBUTORY INFRINGEMENT

56.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–55 of the Complaint as if fully set forth herein.

57.     iFIT is liable for contributory infringement of the '138 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Streaming Products within the United States because the Accused Streaming Products constitute a material part of the invention embodied in the '138 Patent, which iFIT knows to be especially made and/or especially adapted for use in infringement of the '138 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

58.     On information and belief, iFIT is liable for contributory infringement by having knowledge of the '138 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '138 Patent by its customers, including users and subscribers, who use the Accused Streaming Products.

59.     Specifically, iFIT contributes to infringement of the '138 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused Streaming Products to iFIT's customers,

including users and subscribers, for their use of adaptive-rate content streaming as claimed in the '138 Patent. Those customers directly infringe the '138 Patent by using the Accused Streaming Products.

60.     For example, iFIT is liable for contributory infringement by knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, iFIT customers, including users and subscribers, to directly infringe the '138 Patent by using the Accused Streaming Products in the United States.

61.     On information and belief, iFIT knew, or at the very least, should have known, that the Accused Streaming Products were especially made and/or especially adapted for use in infringement of the '138 Patent and were not a staple article or commodity of commerce suitable for substantial non-infringing use.

62.     iFIT continues to provide the Accused Streaming Products with full knowledge and disregard of the ABR Patents, including the '138 Patent.

63.     iFIT's past and ongoing infringement of the '138 Patent has continued and will continue to irreparably harm DISH.

64.     iFIT's past and ongoing infringement of the '138 Patent has continued and will continue to cause DISH damages.

65.     DISH is asserting at least claim 14 of the '138 Patent and some or all of the dependents to those claims.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,677,798
### DIRECT INFRINGEMENT

66.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–65 of the Complaint as if fully set forth herein.

67.     On information and belief, iFIT directly infringes, literally and/or under the doctrine of equivalents, at least claim 11 of the '798 Patent, which recites:

An end user station comprising:

a processor;

a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:

establish one or more network connections between the end user station and at least one server, wherein the at least one server is configured to access at least one of a plurality of groups of streamlets of digital content;

wherein the digital content is encoded at a plurality of different bit rates to create a plurality of streams including at least a first bit rate stream, a second bit rate stream, and a third bit rate stream, wherein each of the first bit rate stream, the second bit rate stream, and the third bit rate stream comprises a group of streamlets encoded at the same respective one of the different bit rates, each group comprising at least first and second streamlets, each of the streamlets corresponding to a portion of the digital content;

wherein at least one of the first bit rate stream, the second bit rate stream, and the third bit rate stream is encoded at a bit rate of no less than 600 kbps; and

wherein the first streamlets of each of the first bit rate stream, the second bit rate stream and the third bit rate stream each has an equal playback duration and each of the first streamlets encodes the same portion of the digital content at a different one of the different bit rates;

determine whether to select a higher or lower bit rate copy of the stream and based on that determination, select a specific one of the first bit rate stream, the second bit rate stream, and the third bit rate stream;

place a first streamlet request to the at least one server over the one or more network connections for the first streamlet of the selected stream;

receive the requested first streamlet from the at least one server via the one or more network connections; and

provide the received first streamlet for output of the digital content to a presentation device.

68.     The Accused Streaming Products receive segments of selected video program for playback of programming over a network connection.  The Accused Streaming Products make an

initial selection of segments from a set of segments with the same content but varying quality based upon the quality of the network connection when the stream is requested.  Exhibit 25 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Products.

69.     On information and belief, iFIT possesses knowledge of, and is aware of, the '798 Patent, at least from the listing of U.S. Patent Application No. 17/962,231, which issued as the '798 Patent, in the Public Schedule of the DISH settlement agreement with Peloton, which was served on iFIT on May 2, 2023.  Exhibit 26, at 22.  At the very least, iFIT became aware of the '798 Patent at the time of filing this lawsuit.

70.     iFIT's acts of infringement have injured and damaged DISH and will continue to injure and damage DISH.

71.     iFIT's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, iFIT will continue these infringing acts unless enjoined by this court.

## INDIRECT INFRINGEMENT BY INDUCEMENT

72.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–**Error! Reference source not found.** of the Complaint as if fully set forth herein.

73.     On information and belief, iFIT is liable for inducing infringement of the '798 Patent under 35 U.S.C. § 271(b) by having knowledge of the '798 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '798 Patent, with specific intent, by its customers.

74.     Specifically, iFIT actively induces infringement of the '798 Patent by, *inter alia*, training its customers on the use of the Accused Streaming Products and/or promotion and/or sales of the Accused Streaming Products to iFIT's customers including, but not limited to, end-users,

subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for implementing adaptive-rate content streaming as claimed in the '798 Patent.

75.    iFIT's customers for the Accused Streaming Products directly infringe the '798 Patent by making, using, selling, and/or offering for sale the Accused Streaming Products.

76.    For example, iFIT actively induces infringement of the '798 Patent, because iFIT has knowledge that end users of the Accused Streaming Products including, but not limited to, users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms, use iFIT's infringing Accused Streaming Products in the United States, and because iFIT encourages such acts resulting in direct patent infringement, by, *inter alia*, training, promotion, and/or sales of the Accused Streaming Products to iFIT customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for their use of adaptive-rate content streaming as claimed in the '798 Patent. *See, e.g.*, Exhibit 15; Exhibit 27; Exhibit 28; Exhibit 29.

77.    On information and belief, iFIT intends to, and continues to intend to, indirectly infringe the '798 Patent through inducement of the sale and use of the Accused Streaming Products.

78.    Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe, and DISH since its acquisition and continuing development of Move's patent portfolio.  On information and belief, as a provider of streamed content and a party to prior ITC proceedings involving patents stemming from the same original parent application, iFIT would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '798 Patent.

79.     On information and belief, despite knowing that its actions constituted induced infringement of the '798 Patent and/or despite knowing that there was a high likelihood that its actions constituted induced infringement of the patent, iFIT nevertheless continued its infringing actions, and continues to make, use, and sell, the Accused Streaming Products.

80.     iFIT continues to provide the Accused Streaming Products with full knowledge and disregard of the ABR Patents, including the '798 Patent.

81.     iFIT's acts of induced infringement have injured and damaged DISH and will continue to injure and damage DISH.

82.     iFIT's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, iFIT will continue these infringing acts unless enjoined by this Court.

### INDIRECT INFRINGEMENT BY CONTRIBUTORY INFRINGEMENT

83.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–82 of the Complaint as if fully set forth herein.

84.     iFIT is liable for contributory infringement of the '798 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Streaming Products within the United States because the Accused Streaming Products constitute a material part of the invention embodied in the '798 Patent, which iFIT knows to be especially made and/or especially adapted for use in infringement of the '798 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

85.     On information and belief, iFIT is liable for contributory infringement by having knowledge of the '798 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '798 Patent by its customers, including users and subscribers, who use the Accused Streaming Products.

86.    Specifically, iFIT contributes to infringement of the '798 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused Streaming Products to iFIT's customers, including users and subscribers, for their use of adaptive-rate content streaming as claimed in the '798 Patent.  Those customers directly infringe the '798 Patent by using the Accused Streaming Products.

87.    For example, iFIT is liable for contributory infringement by knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, iFIT customers, including users and subscribers, to directly infringe the '798 Patent by using the Accused Streaming Products in the United States.

88.    On information and belief, iFIT knew, or at the very least, should have known, that the Accused Streaming Products were especially made and/or especially adapted for use in infringement of the '798 Patent and were not a staple article or commodity of commerce suitable for substantial non-infringing use.

89.    iFIT continues to provide the Accused Streaming Products with full knowledge and disregard of the ABR Patents, including the '798 Patent.

90.    iFIT's past and ongoing infringement of the '798 Patent has continued and will continue to irreparably harm DISH.

91.    iFIT's past and ongoing infringement of the '798 Patent has continued and will continue to cause DISH damages.

92.    DISH is asserting at least claim 11 of the '798 Patent and some or all of the dependents to those claims.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby request a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, DISH respectfully requests that this Court enter:

A.      A judgment in favor of DISH that iFIT has infringed the ABR Patents, directly, jointly, and/or indirectly by way of inducing and/or contributing to the infringement of the ABR Patents;

B.      An order of this Court permanently enjoining iFIT and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others in active concert therewith from infringing, including inducing the infringement of, or contributing to the infringement of, the ABR Patents;

C.      A judgment and order requiring iFIT to pay DISH its damages, costs, expenses, and pre-judgment and post-judgment interest for iFIT's infringement of the ABR Patents, as provided under 35 U.S.C. § 284;

D.      A judgment and order finding this case exceptional under 35 U.S.C. § 285 and awarding DISH its costs, disbursements, and attorneys' fees in connection with this action;

E.      An accounting of lost sales not presented at trial and an award of additional damages for any such lost sales; and

F.      Such other and further relief to which DISH may show itself to be entitled and/or as the Court may deem just and proper.

*Of Counsel:*

G. Hopkins Guy, III
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA  94304-1007
(650) 739-7500
hop.guy@bakerbotts.com

Ali Dhanani
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
(713) 229-1234
ali.dhanani@bakerbotts.com

Kurt Pankratz
BAKER BOTTS L.L.P.
2001 Ross Ave., Suite 900
Dallas, TX  75201
(214) 953-6584
kurt.pankratz@bakerbotts.com

Jamie R. Lynn
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, DC 20001
(202) 639-7700
jamie.lynn@bakerbotts.com

Lisa M. Kattan
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, DC 20004
(202) 639-7701
lisa.kattan@bakerbotts.com

Dated:  September 1, 2023

ASHBY & GEDDES

*/s/ John G. Day*

_____
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiffs*